UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOUIS MARKATOS,

Plaintiff,

v.

CITIBANK, N.A.,

Defendant.

No. 24-CV-0803 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Jeffrey S. Gavenman, Esq.
Schulman Bhattacharya, LLC
North Bethesda, MD
*Counsel for Plaintiff*

Bryan D. Leinbach, Esq.
Zeichner Ellman & Krause LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiff Louis Markatos ("Plaintiff" or "Markatos") brings this Action against Citibank, N.A. ("Defendant" or "Citibank"). (*See generally* Dkt. No. 1 ("Complaint" or "Compl.").)[1] In the Complaint, Plaintiff raises a single breach of contract claim. Specifically, Plaintiff alleges that Defendant breached its contractual duty of ordinary care to Plaintiff when it failed to investigate and intervene to stop electronic wire fund transfers Plaintiff made to internet fraudsters. (*Id.* ¶¶ 50–52.)

---

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

Before the Court is Defendant's Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) (the "Motion"). (*See* Dkt. No. 18.) For the reasons that follow, Defendant's Motion is granted.

I. Background

A. Materials Considered

As a threshold matter, the Court must determine whether it may consider exhibits furnished by both Parties at this stage of the litigation. Plaintiff attached one exhibit to the Complaint—a Client Manual operative as of September 7, 2023, (Compl. Ex. A (the "Client Manual") (Dkt. No. 1-1))—and linked to various websites throughout, (Compl. ¶¶ 29–30, 34–37). Meanwhile, in connection with its Motion, Defendant submitted a copy of a Wire Transfer Agreement operative as of February 2022, which purportedly governed each below-discussed wire transfer Plaintiff made between February 1, 2023, and February 23, 2023. (Decl. of Gillian Newark in Supp. of Mot. ¶ 4 ("Newark Decl.") (Dkt. No. 19); Newark Decl. Ex. A (the "Wire Transfer Agreement") (Dkt. No. 19-1).)

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves" because "[t]o go beyond the allegations in the Complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002); *accord Doe v. County of Rockland*, No. 21-CV-6751, 2023 WL 6199735, at *1 (S.D.N.Y. Sept. 22, 2023). "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Thomas*, 232 F. Supp. 2d at 275; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety . . . , documents

2

incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration adopted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

"Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations adopted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))). Additionally, "even if not attached or incorporated by reference, a document upon which [the complaint] solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks removed) (emphases omitted); *see also Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020) ("Judicial notice may be taken of documents that are integral to the complaint, such that the complaint relies heavily upon [the documents'] terms and effect." (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019)).

Beginning with Plaintiff's materials, it is undisputed that the Court may properly consider the Client Manual, because "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (explaining that a complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference" (citation omitted)); *Tacon v. Cromwell*, No. 23-CV-8100, 2024 WL 4275625, at *2 (S.D.N.Y. Sept. 24, 2024) (same). As for the other materials cited by Plaintiff—specifically, websites and materials published by Citibank, including a Code of Conduct and a press release on "Safeguarding Financial Identity for Senior Citizens," (Compl. ¶¶ 34–36), as well as various third-party materials, including manuals and articles published by the Federal Financial Institutions Examination Council, (*id.* ¶ 29), the American Bankers Association foundation, (*id.* ¶ 30), the Financial Crimes Enforcement Network, (*id.*), and Forbes, (*id.* ¶ 37)—the Court may take judicial notice of these sources, as Defendant does not dispute the authenticity of any of the websites "and [they are] capable of accurate and ready determination," *O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 519 n.2 (S.D.N.Y. 2018); *Hesse*, 463 F. Supp. 3d at 463 (taking "judicial notice of information publicly announced on a party's website"); *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 501 (S.D.N.Y. 2010) (citation and quotation marks omitted) (noting "[i]t is generally proper to take judicial notice of articles and [websites] published on the [i]nternet"); *McNaughton v. de Blasio*, No. 14-CV-221, 2015 WL 468890, at *9 n.10 (S.D.N.Y. Feb. 4, 2015) (taking judicial notice of a publicly available online notice regarding Gmail functionality).

Finally, the Court may also consider the Wire Transfer Agreement submitted in connection with Defendant's Motion. Although Plaintiff does not explicitly reference the Wire

Transfer Agreement in the Complaint, (*see generally* Compl.), this Agreement appears to govern all electronic funds transfers placed with Defendant—i.e., the precise type of transfers at issue here, (*see* Wire Transfer Agreement at 2 ("By placing a funds transfer request with Citibank to transfer funds from your Citibank account to an account at another institution, you agree to the following terms and conditions[.]"); Newark Decl. ¶ 4 ("Between February 1, 2023 and February 23, 2023, [P]laintiff agreed to the terms of the [Wire Transfer Agreement] effective February 15, 2023 . . . each time he directed Citibank to send a wire transfer."). Because "the transactions at issue here would not have occurred but for Plaintiff's execution of [that] document[]," *Jajati v. JPMorgan Chase Bank, N.A.*, 711 F. Supp. 3d 169, 173 (E.D.N.Y. 2024), this document is "integral to the complaint" and to the allegations regarding Defendant's conduct, *see Thomas*, 232 F. Supp. 2d at 276 (finding documents were integral to the complaint where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked"). Moreover, Plaintiff does not challenge the authenticity of this document or dispute that the Agreement controlled the wire transfers at issue. (*See generally* Pl's Mem. of Law in Opp'n to Mot. ("Pl's Opp'n") (Dkt. No. 22); *see id.* at 16 n.10 (conceding that the Wire Transfer Agreement governed the transactions, although arguing "that [Defendant] should not have entered into any of the [Agreements]" in the first place).)

B.  Factual Background

Unless otherwise stated, the following facts are drawn from the Complaint and the above-referenced Client Manual and Wire Transfer Agreement. The facts alleged therein are assumed true for the purpose of resolving the instant Motion. *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

5

1.  <u>The Parties</u>

Defendant is a national association bank with its primary office maintained in South Dakota.  (Compl. ¶ 13.)  Plaintiff, a resident of New York, maintained a personal savings account (the "Account") with Defendant from 1998 to 2023.  (*Id.* ¶ 12.)  Over the course of his twenty-five years banking with Defendant, Plaintiff "used the Account as an ordinary savings account," and did not engage in "large or frequent high-dollar transactions."  (*Id.* ¶ 20.)

Defendant, like other national association banks, is subject to the federal Bank Secrecy Act ("BSA"), which mandates (among other things) that banks maintain "procedures and practices mandat[ing] the tracking and reporting of all bank transactions that are over a certain dollar amount, as well as all bank transactions that exhibit certain suspicious characteristics."  (*Id.* ¶ 26.)  To comply with the BSA, banks must be on alert "for signs of suspicious activity," such as when a customer sends several large funds transfers, transfers funds to "higher-risk geographic location[s]," or conducts banking activity "inconsistent with the customer's business or history."  (*Id.* ¶ 29 (internal quotation marks omitted).)

It is also standard industry practice for banks such as Defendant "to monitor their elderly customers' transactions for evidence of elder financial exploitation."  (*Id.* ¶ 30; *see also* ¶¶ 30–32.)  Consistent with this practice, Defendant maintains a Code of Conduct requiring all of its employees to "comply with the laws, regulations, and Citi policies, standards, and procedures that govern [each employee's] business, region, and/or function," "report concerns about conduct or situations that may put [Citibank's] company or [its] customers at risk," and "[e]scalate unusual or suspicious activity according to the procedures of your business, region, and/or function."  (*Id.* ¶¶ 34–35 (citation omitted).)  Defendant has publicly touted its dedication "to protecting [its] customers' assets and safeguarding their financial identity" and has claimed to

maintain "internal controls that specifically look for patterns of account activity, such as suspicious withdrawals, that might indicate that one of our elder customers may be the target of an attempted fraud."  (*Id.* ¶ 36; *id.* ¶ 37 (quoting a Forbes article highlighting Defendant's "efforts to combat elder financial exploitation").)

    2. <u>The Client Manual</u>

   Plaintiff's use of the Account is governed by the Client Manual, a "binding contract that arose when [Plaintiff] first opened the Account in 1998."  (*Id.* ¶ 45; *see generally* Compl. Ex. A.) The Client Manual, which defines the relationship between Plaintiff and Defendant as only "that of debtor and creditor," specifies that:

> No fiduciary, quasi-fiduciary or other special relationship exists between you [Plaintiff] and us [Defendant].  We owe you a duty of ordinary care.  Any internal policies or procedures that we may maintain in excess of reasonable commercial standards and general banking usage are solely for our own benefit and shall not impose a higher standard of care than otherwise would apply in their absence.

(Compl. Ex. A at 5.)

   With respect to wire transfers, the Client Manual notes that "[w]hen you [the customer] request a funds transfer, you authorize us to debit your account for the amount of the transfer and you also authorize us to charge your account any applicable service fees in accordance with the fee schedule in effect at the time of your request."  (*Id.* at 21.)  The Client Manual warns:

> [Defendant] will rely on the information you provide in making a funds transfer on your behalf.  It is your responsibility to provide [Defendant] with accurate information regarding that transfer . . . . Should you provide an incorrect account number and/or beneficiary institution identifier, you understand that any losses resulting from the funds being credited to the wrong account will be your responsibility.

(*Id.*)

The Manual also notes that Defendant will follow a set security procedure to verify the wire transfers and, further, disclaims responsibility on Defendant's behalf for any incorrect transfers:

> When you place an order for a funds transfer, we will follow a security procedure established for your protection and ours to verify that the transfer has been properly authorized. You understand that the security procedure is designed only to verify the source of the funds transfer instruction and not to detect errors in the content of that instruction or to prevent duplicate transfers. The procedure depends on the means by which you provide instructions to us. . . . By placing a transfer order, you agree to our use of the applicable security procedure. You agree to be bound by any funds transfer request that [Defendant] receives and verifies in accordance with the security procedure outlined above. . . . Except as may be prohibited by federal law, any losses resulting from an incorrect account number or other misidentification of your beneficiary provided by you are your responsibility and not [Defendant's].

(*Id.*)

The Client Manual additionally warns that "the incidents of wire transfer scams have increased significantly" and lists various "[c]ommon scams," such as phishing attempts, false family emergencies and "IRS Imposters." (*Id.* at 23.) The Manual also outlines several "Tips for Wire Transfer Safety," including warnings to: (i) "not send funds to an individual or business you don't know personally"; (ii) "[c]heck the information you include on a wire transfer instruction to verify the information is correct"; (iii) "[i]ndependently confirm (whether in-person or through a trusted third-party) the legitimacy of what you are paying for"; and (iv) not "be rushed into initiating a transfer to anyone claiming an urgent deadline." (*Id.* at 23–24.)

### 3. The Wire Transfer Agreement

The Wire Transfer Agreement similarly applies to electronic funds transfer requests placed with Defendant and "authorize[s] [Citibank] to debit [the customer's] account for the amount of the funds transfer request." (*See* Wire Transfer Agreement at 2.) Similar to the

provisions in the Client Manual, the Agreement provides that "Citibank will rely on the information you [the customer] provide in making a funds transfer on your behalf," noting that "any losses resulting from the funds being credited to the wrong account will be your responsibility." (*Id.*; *id.* at 3 ("If your funds transfer request was . . . erroneously executed as a result of erroneous information provided by you, you understand that you may be responsible for the amount of that transfer and any associated fees.").) The Agreement further notes that, by processing a wire transfer and entering into the Agreement, "you [the customer] agree to indemnify and hold Citibank harmless from and against any and all claims, suits, judgments, executions, liabilities, losses, damages, costs, and expenses . . . in connection with or arising out of Citibank acting upon those funds transfer requests pursuant to this Agreement." (*Id.* at 3.)

          4.   <u>The Internet Scam</u>

       On January 30, 2023, when he was seventy-nine years of age, Plaintiff fell prey to an internet scam that defrauded him of nearly his entire retirement savings. (Compl. ¶ 17.) The scam was conducted as follows. First, Plaintiff was contacted by individuals posing as Apple computer support personnel, Charles Schwab Corporation ("Schwab") (a financial services company) officials, and Federal Reserve System (the "Fed") officials. (*Id.*) Those individuals convinced Plaintiff that certain of his financial accounts were under threat from foreign hackers. (*Id.* ¶¶ 17, 22.) Second, the fraudsters persuaded Plaintiff to liquidate his holdings from the three "threatened" accounts and transfer those assets into the Account. (*Id.* ¶ 18, 22.) From there, Plaintiffs was instructed to wire those funds from the account to "safe" accounts allegedly owned by the Fed at two banks in Hong Kong: the Bank of East Asia and Hang Seng Bank. (*Id.* ¶¶ 18, 22.) These funds were to remain in the Hong Kong banks until the alleged hacker threat had

been neutralized, after which the funds would be returned to new accounts in the original financial institutions where Plaintiff maintained them.  (*Id.* ¶ 18.)

Over the course of twenty-three days, beginning on January 31, 2023, Plaintiff liquidated the majority of his assets from three financial accounts—a Schwab account, a Muriel Siebert & Co. individual retirement account ("IRA"), and a BNY Mellon/Pershing IRA—and transferred those assets to the Account.  (*Id.* ¶ 22.)  During the same period, Plaintiff went in person seven separate times to his local Citibank branch in Chappaqua, New York, each time instructing Defendant to execute wire transfers from the Account to specific beneficiaries at the Bank of East Asia and the Hang Seng Bank.  (*Id.* ¶ 23.)  The seven wire transfers totaled $1,511,700.00, (*id.*), representing most of Plaintiffs "life savings," (*id.* ¶¶ 38, 42).

Although the wire transfers indicated "signs of suspicious account activity," thus putting Defendant "on notice that [Plaintiff's] assets were at risk," none of these transactions "triggered Citibank's fraud-related systems and protocols."  (*Id.* ¶ 38.)  Defendant did not "report[], question[], or investigate[]" any of the wire transfers" or freeze the Account; instead, Defendant "took no action whatsoever."  (*Id.*)  Plaintiff sought reimbursement for these transfers from Defendant in January 2024, which Defendant denied.  (*Id.* ¶ 43 n.15.)

C.  Procedural Background

Plaintiff initiated this Action on February 2, 2024.  (*See* Compl.)  On April 30, 2024, Defendant filed a letter seeking leave to file a motion to compel arbitration.  (Dkt. No. 7.)  Defendant withdrew this application on June 10, 2024, (Dkt. No. 12), and, a week later, filed a letter seeking leave to file the instant Motion, (*see* Letter from Bryan D. Leinbach, Esq. to Court (June 17, 2024) (Dkt. No. 14)).  Plaintiff filed a response on June 24, 2024.  (*See* Letter from Jeffrey S. Gavenman, Esq. to Court (June 24, 2024) (Dkt. No. 15).)  On July 12, 2024, the Court

held a pre-motion conference, during which it adopted a briefing schedule. (*See* Dkt. (minute entry for July 12, 2024); Scheduling Order (Dkt. No. 17).)

Pursuant to that briefing schedule, Defendant filed its Motion on August 2, 2024. (*See* Motion (Dkt. 18); Decl. of Gillian Newark in Supp. of Mot. ("Newark Decl.") (Dkt. No. 19); Decl. of Bryan D. Leinbach, Esq. in Supp. of Mot. ("Leinbach Decl.") (Dkt. No. 20); Mem. of Law in Supp. of Mot. ("Def's Mem.") (Dkt. No. 21).) Plaintiff filed his Opposition on August 23, 2024. (*See* Pl's Opp'n.) After Defendant requested, and was granted, an extension to submit a Reply, (*see* Dkt. Nos. 23–24), Defendant filed its Reply on September 13, 2024, ("Reply" (Dkt. No. 25)). On December 4, 2024, Defendant filed a letter alerting the Court to supplemental authority regarding its Motion, (Dkt. No. 27), to which Plaintiff replied on December 13, 2024, (Dkt. No. 28).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed."  *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

B.  Analysis

Plaintiff brings a single claim for breach of contract, alleging that Defendant breached the

"duty of ordinary care" agreed to in the Client Manual, (Compl. ¶ 46), by "fail[ing] to investigate

and intervene to stop each of Mr. Markatos's seven wire transfers," (*id.* ¶ 52; *id.* ¶¶ 44–54).

Defendant argues that Plaintiff's claim is preempted by Article 4-A of the New York Uniform

Commercial Code ("Article 4-A" and the "UCC"), which provides the exclusive remedy for

claims concerning the mechanics of wire transfers.  (Def's Mem. 14–17.)  Alternatively,

Defendant argues that even if the claim is not preempted, it is (i) not adequately pled, (*id.* at

20–24), and (ii) belied by the express terms of the Client Manual and the Wire Transfer

Agreement, (*id.* at 18–20).

The Court will address Defendant's arguments to the extent necessary to resolve the

instant Motion.

1.  Article 4-A Preemption

The Court begins with Defendant's contention that Plaintiff's breach of contract claim is

preempted by Section 202 of Article 4-A of the UCC.  (Def's Mem. 14–17.)  For the reasons

explained below, the Court agrees.

"Article 4-A of the New York Uniform Commercial Code governs electronic funds

transfers, commonly known as wholesale wire transfers."  *Ma v. Merrill Lynch, Pierce, Fenner

& Smith, Inc.*, 597 F.3d 84, 87 (2d Cir. 2010) (citing N.Y. UCC § 4-A-102 & cmt.).

Article 4-A, which was promulgated to "address the problems presented by the widespread use

of electronic funds transfers," is a "'comprehensive body of law' that 'use[s] precise and detailed

rules to assign responsibility.'"  *Id.* at 89 (quoting N.Y. UCC § 4-A-102 cmt.).  Prior to 4-A's

enactment, courts resolved fund transfer disputes by reference to "general principles of common

law or equity." *Id.* (quotation omitted). "Article [4-A] rejected this piecemeal approach in favor of a more disciplined regime," *id.*, which was designed instead to be the "exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article," *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 801 (2d Cir. 2011). Accordingly, the statute "preclude[s] common law claims when such claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4-A." *Niram, Inc. v. Sterling Nat'l Bank*, 697 F. Supp. 3d 15, 28 (S.D.N.Y. 2023) (citing *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 103 (2d Cir. 1998)).

"However, not all common law claims 'are per se inconsistent with this regime.'" *Id.* at 28 (quoting *Ma*, 597 F.3d at 89); *see also Sheerbonnet Ltd. v. Am. Exp. Bank, Ltd.*, 951 F. Supp. 403, 407–08 (S.D.N.Y. 1995) ("The exclusivity of Article 4-A is deliberately restricted to any situation covered by particular provisions of the Article. Conversely, situations not covered are not the exclusive province of the Article." (internal quotation marks omitted)). As the Second Circuit has explained, because "Article [4-A] controls how electronic funds transfers are conducted and specifies certain rights and duties related to the execution of such transactions," some "[c]laims that . . . are *not* about the mechanics of how a funds transfer was conducted may fall outside this regime." *Ma*, 597 F.3d at 89 (emphasis added). However, "common law claims about the existence of unauthorized wire transfers or an unauthorized signature on a check, and the mechanics of how those transactions were conducted, fall within the regime of Article 4-A," *2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 236 (S.D.N.Y. 2011), because "Section 4-A-204 provides the exclusive means by which a bank has a duty to refund a customer for such an unauthorized payment," *Niram*, 697 F. Supp. 3d at 30; N.Y. U.C.C. § 4-A-204 (providing that a bank must refund the customer where it "accepts a

14

payment order issued in the name of [that] customer as sender which is [ ] not authorized and not effective as the order of the customer under [Section 202]"); *see also Fischer*, 632 F.3d at 797 (noting Article 4-A permits some of its provisions to be modified by contract). In contrast, claims *not* based on the mechanics of the transfer itself—such as claims "based on Defendant's actions *before and after* the processing of the wire transfer"—are not always preempted. *Jakob v. JPMorgan Chase Bank, N.A.*, 639 F. Supp. 3d 406, 412 (E.D.N.Y. 2022) (emphasis in original) (internal quotation marks omitted) (citing *Pedersen v. MidFirst Bank*, 527 F. Supp. 3d 188, 193 (N.D.N.Y. 2021)); *see also Beck v. Metro. Bank Holding Corp.*, No. 23-CV-7564, 2024 WL 3849461, at *10 (E.D.N.Y. Aug. 16, 2024) (holding a common law contract claim was not preempted by Article 4-A where it concerned an agreement that a bank conduct an internal review for all authorized wire transfers); *Sheerbonnet*, 951 F. Supp. at 412 (noting allegations unrelated to "transactional" funds transfer errors were not preempted as they "d[id] not fit neatly into any of Article 4-A's 'precise and detailed rules'").

To determine whether a claim is preempted, the "critical inquiry is whether [Article 4-A's] provisions protect against the type of underlying injury or misconduct alleged in a claim." *Ma*, 597 F.3d at 89–90. In conducting this inquiry, the Second Circuit has emphasized "that Article 4 precludes common law claims that would impose liability inconsistent with the rights and liabilities expressly created by Article 4." *Fischer*, 632 F.3d at 798.

Here, Plaintiff asserts that because Article 4-A only applies where (i) "there is an error in the actual mechanics of executing a funds transfer" or (ii) "a funds transfer is not authorized,"

and neither circumstance applies to his claim, it is not preempted. (Pl's Opp'n 13 (quoting *Bloom v. PNC Bank, N.A.*, 659 F. Supp. 3d 27, 31 (D.D.C. 2023)).)[2] The Court is unpersuaded.

Plaintiff first argues his claim has "nothing to do with the mechanics of the wire transfers at issue[,]" but instead relates only to "the failure of Citibank and its employees to notice, investigate, and intervene"—a type of claim "the [UCC] does not address head-on and that requires gap-filling from the common law." (Pl's Opp'n 14–15; *see also* Compl. ¶ 38 (alleging that "each wire should have triggered Citibank's fraud-related systems and protocols" and "been reported, questioned, and investigated"); *id.* (alleging "the Account should have been frozen" so that no more transfers could take place, thus "prevent[ing] the loss of [Plaintiff's] life savings").)

Plaintiff's claim, at its core, is that he was induced by the fraudulent representations of a third party to authorize the transfer orders, which Defendant accepted without utilizing any heightened measures to protect Plaintiff from said fraud. (*E.g.*, *id.* ¶¶ 24, 38–39.) Put another way, Plaintiff's claim is entirely dependent on Defendant's *execution* of those transfers—essentially, that Defendant improperly processed them by failing to implement or engage in necessary security procedures. Yet, the courts have held that these procedures are precisely the type of "mechanics" governed by Article 4-A and Plaintiff's claim is thus preempted. *See Beck*, 2024 WL 3849461, at *11–14 (holding a breach of contract claim based on failed security procedures was partially preempted by Article 4-A); *Ma*, 597 F. 3d at 89 (identifying provisions

---

[2] As Plaintiff clarified in a letter submitted after briefing was completed, the quoted language in Plaintiff's Opposition was erroneously attributed to *Ma* when, in fact, it was pulled from *Bloom*'s discussion of *Ma*. (Dkt. No. 26).

that "calls for banks to adopt certain security procedures" as part of Article 4-A's specific "rights and duties related to the execution of such transactions").[3]

"Article 4-A creates a scheme to set clear rules as to who bears the loss for unauthorized transactions." *Niram*, 697 F. Supp. 3d at 21 (internal quotation marks omitted). Under this scheme, the customer bears the risk of loss if a payment is "authorized" or "effective" (i.e., if a bank did not comply with commercially reasonable security procedures under § 4-A-202(2)). N.Y. UCC § 4-A-202; *Beck*, 2024 WL 3849461, at *8. In contrast, a bank may be liable for not accepting a payment order it is required to accept, N.Y. UCC § 4-A-212, or for accepting a payment order that is "not authorized or nor effective as the order of the customer," *id.* § 4-A-204; *see Ma*, 597 F.3d at 88 (noting "banks bear the risk of loss from unauthorized wire transfers"). In other words, "Section 4-A-202(2) is an exception to the default rule that the bank bears the loss of any unauthorized funds transfer." *Wellton Int'l Exp. v. Bank of China (Hong Kong)*, 612 F. Supp. 3d 358, 363 (S.D.N.Y. 2020).

Yet, Plaintiff's theory of liability is inconsistent with the exception to this default rule, because, by attempting to impose common law liability on a bank for processing an *authorized* transfer—even if fraudulently induced by a third party—Plaintiff is inverting this risk allocation

---

[3] Plaintiff repeatedly cites *Sheerbonnet* to suggest that Article 4-A only preempts "transactional" rules, i.e., those "aimed essentially at resolving conflicts created by erroneous instruction or execution of payment orders." (Pl's Opp'n 14 (quoting *Sheerbonnet*, 951 F. Supp. at 412).) Plaintiff's reliance on this case is misplaced. *Sheerbonnet* involved a defendant bank that credited transferred funds to an insolvent company's account (despite knowing the account was frozen) before asserting its own rights to the funds to offset the debt the insolvent debtor owed it. 951 F. Supp. at 405. The bank's self-interested maneuvers were not directly addressed by the UCC and thus, any common law claims arising from them were not preempted. *Id.* at 412. As explained above, this is in stark contrast to the funds transfers here, which are squarely governed by Article 4-A. Plaintiff's citation to *Koss Corp. v. Am. Exp. Co*, 233 Ariz. 74 (Ariz. Ct. App. 2013), which concerned a defendant bank that knowingly accepted and used embezzled funds, is similarly unpersuasive. *Id.* at 80.

scheme in a way that is fundamentally incompatible with Article 4-A.  *See Beck*, 2024 WL 3849461, at *10 ("Article 4-A does not require banks to bear the risk of loss for failing to abide by certain security procedures where the sender *has directly authorized the transfer* under Section 202(1)") (emphasis in original); *id.* at *11 n.21 (collecting cases).  And, because allowing such claims would plainly be inconsistent with Article 4-A, courts in the Second Circuit and elsewhere have similarly concluded that Article 4-A may preempt certain common law claims where the customer authorized wire transfers, even when that authorization was induced by third-party fraud.  *Id.* at *10 (finding a breach of contract claim was partially preempted because "holding [defendant] liable in this context, where [plaintiff] authorized both Wire Transfers, is inconsistent with Article 4-A, . . . even where the plaintiff was allegedly induced to take that action by various fraudulent representations made by [a] third party" (internal citation and quotation marks omitted)); *Jajati*, 711 F. Supp. 3d at 177 (rejecting an argument similar to Plaintiff's here because it was "simply another way of saying that [d]efendant should have canceled the wire transfers upon learning of the fraud," which "is no different than had [p]laintiff attempted to cancel the transactions . . . after [the bank] had begun to process the orders.  In other words, [p]laintiff is complaining about conduct that is squarely within the ambit of Article 4-A."); *In re Est. of Cook*, No. 23-CV-9, 2023 WL 3467209, at *2 (E.D. Va. May 15, 2023) (dismissing common law claims based on authorized transactions induced by scammers because the UCC, as adopted in Virginia, "expressly preempts liability on the part of a bank for conduct that occurs before a bank accepts a payment order"); *Kirschner v. Wells Fargo Bank*, No. 21-CV-10785, 2021 WL 5545957, at *3 (E.D. Mich. July 19, 2021) (dismissing a conversion claim based on fraudulently induced wire transfers because "[i]mposing liability on a receiving bank for declining to agree to cancel a funds transfer would be inconsistent with Article [4-A]," as

adopted in Michigan); *Wellton*, 612 F. Supp. 3d at 363–64 (finding a bank not liable under

Article 4-A for losses resulting from a transfer initiated in response to third-party fraud because

the transfer was "unequivocally authorized"); *cf. Blum v. Citibank, NA*, 81 N.Y.S.3d 51, 52 (N.Y.

App. Div. 2d Dept. 2018) (dismissing a negligence claim based on a defendant bank processing

authorized transactions induced by "fraudulent misrepresentations by [a] third party" because

plaintiff pled no "legally cognizable cause of action").[4]  *But see Bloom*, 659 F. Supp. 3d at 31

(holding a common law contract claim was not preempted where the plaintiff alleged the bank

"failed to respond appropriately to clear indications that [plaintiff] was being defrauded," which

did not "fit[]squarely within the terms of the Article").[5]

　　Nor does Plaintiff's second argument fare any better.  Specifically, Plaintiff argues his

claim is not preempted because the transactions at issue were authorized, not unauthorized.  (*See*

Pl's Opp'n 13–16.)[6]  But the key question here is whether the common law claim "would impose

---

[4] Further, under Article 4-A, a bank has no duty "before acceptance" of a transfer order "to take any action, or refrain from taking action, with respect to the order except as provided in this Article and by express agreement," and any liability based upon the acceptance of a transfer order "is limited to that provided in this Article."  N.Y. UCC § 4-A-212.  Accordingly, it would be inconsistent with the statute to impose liability on Defendant for the actions it did not take before accepting the wire transfers—i.e., not vetting the transfers for "red flags" and freezing the Account—particularly when that liability has been expressly confined by statute.

[5] As noted Infra note 7, *Bloom*'s reasoning was predicated on a misreading of *Ma*, which 7dilutes its persuasiveness.

[6] Plaintiff is correct that the bulk of Defendant's authority concerns unauthorized transactions.  Although Defendant attempts to recast these decisions as involving *authorized* transactions, (*see* Def's Mem. 14–15; Reply 6–7), it is clear that those transactions were unauthorized, *see Ma*, 597 F.3d at 89 (holding Article 4-A preempted claims that were "at their core, assertions that [plaintiff] did not order or approve any of the disputed electronic transfers of funds from his accounts"); *123RF LLC v. HSBC Bank USA, N.A.*, 663 F. Supp. 3d 391, 402 (S.D.N.Y. 2023) (holding a claim was preempted by Article 4-A where plaintiff alleged the defendant "execut[ed] unauthorized [transfers] in contravention of the agreed upon security procedures"); *2006 Frank Calandra*, 816 F. Supp. 2d at 236 (finding, on a motion for summary judgment, claims were preempted because "claims about the existence of unauthorized wire

liability inconsistent with the rights and liabilities expressly created by Article 4," *Fischer*, 632

F.3d at 798, and, as discussed above, imposing common law liability on a bank for properly

processing an authorized transfer is flatly inconsistent with Article 4's regime.[7]

Thus, the Court concludes that Plaintiff's breach of contract claim is preempted by

Article 4-A and must be dismissed.[8]

2. <u>Breach of Contract Claim</u>

Alternatively, even were Plaintiff's breach of contract claim not preempted by statute, it

must be dismissed as insufficiently pled.

"In a breach of contract case, a plaintiff must plead (1) the existence of a contract

between itself and that defendant; (2) performance of the plaintiff's obligations under the

---

transfers or an unauthorized signature on a check . . . fall within the regime of Articles 4-A and 4"); *Niram, Inc.*, 697 F. Supp 3d at 29 (finding, at summary judgment, "no genuine issue of material fact that [plaintiff's] breach of contract claim for unauthorized transfers is preempted by Article 4-A"). Because there is no dispute the transactions here were authorized, (Def's Mem. 6; Pl's Opp'n 14), much of this caselaw has little bearing on why Plaintiff's claim here is preempted by Article 4-A.

[7] Plaintiff cites no authority supporting the proposition that all authorized transactions fall outside Article 4-A by default, instead relying only on an out-of-circuit case describing *Ma* as limiting Article 4-A preemption to only unauthorized transfers or claims relating to the mechanics of transfers. (Pl's Opp'n 13 (citing *Bloom*, 59 F. Supp. 3d at 31)); *see also* Dkt. No. 26 (clarifying citation). *Ma*, however, should not be read so narrowly. The Second Circuit did not hold that Article 4-A *cannot* preempt claims based on authorized wire transfers; it merely held that Article 4-A *does* preempt claims based on unauthorized wire transfers. *Ma*, 597 F.3d at 88, 90.

[8] Defendant's notice of supplemental authority, (Dkt. No. 27), which directs the Court's attention to a recent decision in this District, *United States ex rel. Pinnacle Env't Corp. v. Volmar*, No. 23-CV-10732, 2024 WL 4892740 (S.D.N.Y. 2024), supports the same conclusion. The *Volmar* court held that a claim that a bank "fail[ed] to properly monitor, and therefore, detect that the account . . . to which the funds were wired was fraudulent" was "plainly preempted" by Article 4-A. *Id.* at *1. The court noted that to hold otherwise "would imply a duty [] to monitor and investigate transfer instructions . . . that is wholly absent from the U.C.C." *Id.* The Court agrees and concludes that Plaintiff's attempts to distinguish *Volmar*, (*see* Dkt. No. 28), are unpersuasive for the same reasons discussed above.

contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 413 (S.D.N.Y. 2022) (citation and internal quotation marks omitted). "[A] breach of contract claim will be dismissed where a plaintiff fails to allege the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated." *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA.,* 698 F. Supp. 3d 663, 673–74 (S.D.N.Y. 2023) (internal quotation marks omitted) (citing *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644–45 (S.D.N.Y. 2011)).

There is no dispute that the Parties had a contract in the form of the Client Manual or that Plaintiff completed his obligations under this agreement. Instead, the single element in dispute is whether Plaintiff sufficiently pled that Defendant breached any provision of that agreement. Plaintiff points to one contractual provision—stating that Defendant owes Plaintiff "a duty of ordinary care," which is undefined in the Manual, (Compl. Ex. A at 5)—and alleges that Defendant breached it by: (i) "fail[ing] to maintain or fail[ing] to employ its industry-standard protocols, which, if properly maintained and employed, would have led Citibank to flag, investigate, and intervene" in the wire transfers; and (ii) "fail[ing] to recognize or fail[ing] to respond to obvious evidence of elder financial exploitation," (Compl. ¶ 39).

Although courts must take all factual allegations in the complaint as true on a motion to dismiss, and draw from them all reasonable inferences, courts are not required to accept "[c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Porter v. Bunch*, No. 16-CV-5935, 2019 WL 1428431, at 10 (S.D.N.Y. Mar. 29, 2019). Plaintiff's claim that Defendant breached its "duty of ordinary care" is a legal conclusion couched as a factual allegation, and the Complaint does not provide factual allegations sufficient to infer that

Defendant breached said duty. *See Beck*, 2024 WL 3849461, at *12 (granting a motion to dismiss as plaintiff's allegation that a defendant bank "fail[ed] [to] comply" with an agreement was "a legal conclusion—that [defendant] breached the Agreements—couched as a factual allegation"); *P&G Auditors & Consultants, LLC v. Mega Int'l Com. Bank Co.*, No. 18-CV-9232, 2019 WL 4805862, at *5 (S.D.N.Y. Sept. 30, 2019) (granting a motion to dismiss a breach of contract claim where the allegation that defendant breached the agreement was merely "a legal conclusion dressed up as a factual allegation"); *Swan Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012) (granting a motion to dismiss where a complaint "d[id] not specify . . . through what actions or inactions" defendant was alleged to have breached the contract, because the court "is not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)); *Am. Nat'l Theatre & Acad. v. Am. Nat'l Theatre Inc.*, No. 05-CV-4535, 2006 WL 4882916, at *4 (S.D.N.Y. Sept. 27, 2006) (granting a motion to dismiss a breach of contract claim as "the [c]ourt is not required to accept the plaintiff's conclusory allegations or legal conclusions on a motion to dismiss").

To the contrary, far from pleading a breach of contract, Plaintiff has only demonstrated the Defendant complied with the Client Manual. Plaintiff alleges that Defendant executed the wire transfers upon receipt of the beneficiary information, (Compl. ¶¶ 22–23), following the exact process outlined in the Manual, (Compl. Ex. A at 21; *see also* Wire Transfer Agreement at 2). Additionally, by agreeing to be bound to the terms of the Client Manual, Plaintiff agreed that, when placing a funds transfer, Defendant would "follow a security procedure" that "is designed only to verify the source of the funds transfer instruction and not to detect errors in the content of that instruction or to prevent duplicate transfers." (Compl. Ex. A at 21.) Plaintiff offers no allegations suggesting Defendant did not follow this procedure in executing any of the transfers

22

at issue—only that Defendant did not adhere to other industry-standard controls *not* agreed to in

the Manual.  (*See* Compl. ¶¶ 38–39; *see generally* Compl. Ex. A at 21.)  Further, Plaintiff agreed

"to be bound by any funds transfer request that [Defendant] receives and verifies in accordance

with the security procedure outlined above."  (Compl. Ex. A at 21; *see also* Wire Transfer

Agreement at 2–3.)  Rather than alleging breach, this only demonstrates that Plaintiff's claim is

expressly precluded by contract.[9]  (*See* Def's Mem. 18–20.)

      In an attempt to demonstrate breach, Plaintiff appeals to the definition of "ordinary care"

from UCC Article 3 (as imputed to banks under Article 4), namely, the "observance of

reasonable commercial standards, prevailing in the area in which the person is located, with

respect to the business in which the person is engaged."  N.Y. UCC § 3-103(a)(9); *id.* § 4-103

cmt. 4.  (Pl's Opp'n 22–23.)  Although Article 4 mandates that no agreement can disclaim "a

bank's responsibility for its . . . failure to exercise ordinary care," it also provides that parties can,

"by agreement determine the standards by which such responsibility is to be measured if such

standards are not manifestly unreasonable."  N.Y. UCC § 4-103(1).  Here, the Client Manual

makes clear that the Parties did not agree to the heightened level of responsibility that Plaintiff is

---

      [9] In a similar vein, Defendant argues that Plaintiff's claim is expressly precluded by the indemnity provision in the Wire Transfer Agreement, the "broad scope" of which, "[b]y necessity, . . . include[s] plaintiff's claim[]."  (Reply 14; Def's Mem. 19.)  But Defendant reads the provision too broadly.  "[U]nder New York law, absent 'unmistakably clear' language in an indemnification provision that demonstrates that the parties intended the clause to cover first-party claims, an agreement between two parties 'to indemnify' each other does not mean that one party's failure to perform gives rise to a claim for indemnification."  *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 125 (2d Cir. 2019).  Without such "unmistakably clear" language, "where those lo[s]ses do not relate to liability to a third party, the characterization of 'indemnification' is no more than an epithet for recovery for breach of contract."  *Sussman Sales Co., Inc. v. VWR Int'l, LLC*, No. 20-CV-2869, 2021 WL 1165077, at \*19 (S.D.N.Y. Mar. 26, 2021).  Because no such clear language exists here, the Wire Transfer Agreement's indemnity clause applies only to third-party claims and it thereby does *not* serve as an independent bar to Plaintiff's claim.

now attempting to ascribe to Defendant.  (Compl. Ex. A at 5 ("No fiduciary, quasi-fiduciary or other special relationship exists between" the parties); *id.* ("Any internal policies or procedures that [Defendant] may maintain in excess of reasonable commercial standards and general banking usage are solely for [Defendant's] own benefit and shall not impose a higher standard of care than otherwise would apply in their absence.").)[10]

Thus, Plaintiff's vague allegations that Defendant breached its "duty of ordinary care" by failing to adhere to its own Code of Conduct or follow industry-standard practices—none of which are mandated in the Manual—are plainly insufficient to plead breach of contract.  *See Beck*, 2024 WL 3849461, at *12 (holding plaintiff failed to allege a breach of contract claim "because they do not plausibly allege that the Agreements required [defendant] to 'adopt and implement security procedures reasonably designed to protect [plaintiff] from wire transfers that [plaintiff] authorized due to misrepresentations of a third party.'"); *Banco del Austro, S.A. v. Wells Fargo Bank, N.A.*, 215 F. Supp. 3d 302, 306 (S.D.N.Y. 2016) (dismissing a breach of contract claim based on failure to adhere to security procedures because plaintiff "does not plausibly allege that [defendant] deviated from that procedure"); *cf. 2006 Frank Calandra*, 816 F. Supp. 2d at 237 ("The bank-customer relationship provides for no greater implied responsibilities than those expressly stated in the banking agreements.").

Accordingly, Plaintiff has failed to plausibly plead a breach of contract claim.

---

[10]  To the extent Plaintiff's claim sounds in negligence, rather than contract, it is similarly unsuccessful.  *See Beck*, 2024 WL 3849461, at *16 (dismissing a negligence claim based on fraudulently induced transfers as "duplicative of [plaintiff's] breach of contract claim because the negligence claim does not arise out of any legal duty independent of the contract and it does not allege any separate injuries"); *cf. L. Offs. of Oliver Zhou v. Citibank N.A.,* No. 15-CV-5266, 2016 WL 2889060, at *3 (S.D.N.Y. May 17, 2016) ("Provisions such as section 4-202 of the UCC displace common law negligence principles . . . .  Timely compliance with the section 4-202 responsibilities constitutes ordinary care and is not negligent as a matter of law." (internal citation omitted)).

### III.  Conclusion

For the foregoing reasons, the Motion is granted.  The Court's dismissal of the Complaint is without prejudice because this is the first adjudication of Plaintiff's claim on the merits.  If Plaintiff wishes to file an amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within thirty days of the date of this Opinion & Order.  *See Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *19 (S.D.N.Y. Mar. 25, 2019) ("The Court will afford Plaintiff an opportunity to amend if, after reviewing this Order and Opinion and the law therein, he still believes that he can plausibly state claims against Defendants." (alteration adopted) (citation omitted)).  There will be no extensions.  Plaintiff is further advised that an amended complaint will completely replace, not supplement, the now-dismissed Complaint.  Any amended complaint must therefore contain *all* of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider.  If Plaintiff fails to timely file an amended complaint, the dismissed claims may be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the pending Motion.  (Dkt. No. 18.)

SO ORDERED.

Dated:    December 18, 2024
          White Plains, New York

                                                    KENNETH M. KARAS
                                      United States District Judge