UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOUIS MARKATOS,

*Plaintiff,*

v.

CITIBANK, N.A.,

*Defendant.*

No. 24-CV-803 (KMK)

ORDER & OPINION

Appearances:

Jeffrey Samuel Gavenman, Esq.
Schulman Bhattacharya, LLC
North Bethesda, MD
*Counsel for Plaintiff*

Bryan Dean Leinbach, Esq.
Zeichner Ellman & Krause LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiff Louis Markatos ("Plaintiff" or "Markatos") brings this Action against Citibank,

N.A. ("Defendant" or "Citibank"). (*See generally* Am. Compl. ("FAC" or the "Amended

Complaint") ¶ 1 (Dkt. No. 30).)[1] In the Amended Complaint, Plaintiff raises six counts for

Breach of Contract. (*See id.* ¶¶ 72–120.) Each is based on a theory that, after Plaintiff executed

transactions bearing multiple hallmarks of fraud, Defendant breached a duty of ordinary care to

---

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

Plaintiff by failing to freeze his account, take certain actions to prompt further investigation, or otherwise to prevent subsequent fraudulent transactions. (*See id.*)

Before the Court is Defendant's Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (*See* Mot. to Dismiss (Dkt. No. 37).) For the reasons that follow, Defendant's Motion is granted.

### I. Background

#### A. Materials Considered

At the outset, the Court must determine whether it may consider exhibits furnished by both Parties at the pleading stage. Attached to the FAC and the renewed Motion to Dismiss, the Parties have included essentially the same materials they submitted in conjunction with the first Complaint and Defendant's first Motion to Dismiss. (*Compare* Compl., Ex. A (Dkt. No. 1-1) *with* FAC, Ex. A (the "Client Manual") (Dkt. No. 30-1); Decl. of Gillian Newark in Supp. of Mot. to Dismiss, Ex. A (Dkt. No. 19-1) *with* Decl. of Bryan D. Leinbach ("Leinbach Decl."), Ex. A (the "Wire Transfer Agreement"), at 4–6 (Dkt. No. 38-1).) Plaintiff attached one exhibit to the Amended Complaint—a Client Manual operative as of September 7, 2023, (*see* Client Manual)—and links to various websites throughout, (FAC ¶¶ 9 n.2, 57 n.3, 58 n.4, 58 n.5, 62 n.6, 64 n.11, 65 n.13). Meanwhile, in connection with its Motion, Defendant resubmitted a copy of a Wire Transfer Agreement operative as of February 2022, which purportedly governed each below-discussed wire transfer Plaintiff made between February 1, 2023, and February 23, 2023. (Wire Transfer Agreement at 4–6.)

On a motion to dismiss pursuant to Rule 12(b)(6), "the Court's review is [typically] confined to the pleadings themselves" because "[t]o go beyond the allegations in the Complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56."

*Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted); *accord Doe v. County of Rockland*, No. 21-CV-6751, 2023 WL 6199735, at *1 (S.D.N.Y. Sept. 22, 2023).  "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment."  *Thomas*, 232 F. Supp. 2d at 275 (citation omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that a court "ruling on Rule 12(b)(6) motions to dismiss" may "consider the complaint in its entirety . . . , documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration adopted) (quoting S*amuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

As a general rule, a court may consider documents referenced on a Rule 12(b)(6) Motion where "(1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed."  *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (citation omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations adopted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*,

No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).  Further, even where a document is not "attached or incorporated by reference, a document upon which [the complaint] solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks removed) (emphases omitted); *see also Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020) ("Judicial notice may be taken of documents that are integral to the complaint, such that the complaint relies heavily upon [the documents'] terms and effect.") (internal quotation marks removed) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019)).

Here, the Court reaches the same conclusions it did when resolving the scope of its inquiry on the first Motion to Dismiss.  The Court:

> may properly consider the Client Manual, because "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (explaining that a complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference" (citation omitted)); *Tacon v. Cromwell*, No. 23-CV-8100, 2024 WL 4275625, at *2 (S.D.N.Y. Sept. 24, 2024) (same).  As for the other materials cited by Plaintiff— specifically, websites and materials . . . as well as various third-party materials, . . . —the Court may take judicial notice of these sources, as Defendant does not dispute the authenticity of any of the websites "and [they are] capable of accurate and ready determination," *O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 519 n.2 (S.D.N.Y. 2018); *Hesse*, 463 F. Supp. 3d at 463 (taking "judicial notice of information publicly announced on a party's website"); *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 501 (S.D.N.Y. 2010) (citation and quotation marks omitted) (noting "[i]t is generally proper to take judicial notice of articles and [websites] published on the [i]nternet"); *McNaughton v. de Blasio*, No. 14-CV-221, 2015 WL 468890, at *9 n.10 (S.D.N.Y. Feb. 4, 2015) (taking judicial notice of a publicly available online notice regarding Gmail functionality).

*Markatos v. Citibank, N.A.*, 760 F. Supp. 3d 70, 74–75 (S.D.N.Y. 2024).  Further, the Court will again consider the Wire Transfer Agreement submitted in connection with Defendant's Motion.  As explained in the Court's earlier decision, although "Plaintiff

does not explicitly reference the Wire Transfer Agreement in the [FAC]," (*see generally* FAC), "this Agreement appears to govern all electronic funds transfers placed with Defendant—i.e., the precise type of transfers at issue here," (*see* Wire Transfer Agreement at 5 ("By placing a funds transfer request with Citibank to transfer funds from your Citibank account to an account at another institution, you agree to the following terms and conditions[.]")); Leinbach Decl., Ex. A ¶ 4 ("Between February 1, 2023 and February 23, 2023, [P]laintiff agreed to the terms of the [Wire Transfer Agreement] effective February 15, 2023 . . . each time he directed Citibank to send a wire transfer."). In light of the fact that "the transactions at issue here would not have occurred but for Plaintiff's execution of [that] document[ ]," *Jajati v. JPMorgan Chase Bank, N.A.*, 711 F. Supp. 3d 169, 173 (E.D.N.Y. 2024) (citation omitted), the Court again determines that the document is integral to both the FAC and to the allegations regarding the conduct that gave rise to this Action, *see Thomas*, 232 F. Supp. 2d at 276 (determining documents were integral to the complaint given that plaintiff needed to rely on their content to explain "the actual unlawful course of conduct was on which the [d]efendants embarked"). There is no challenge to the authenticity of the document, nor any dispute that the Agreement controlled the wire transfers at issue in this Action. (*See generally* Response in Opp'n ("Pl.'s Opp'n") (Dkt. No. 40).) *See also Scalabrini v. PMAB, LLC*, No. 18-CV-11152, 2020 WL 1049167, at *4 n.4 (S.D.N.Y. Mar. 3, 2020) ("The Court may take judicial notice of these . . . records . . . as there is no dispute as to their accuracy or authenticity.") (citation omitted).

B. Factual Background

1. The Parties

Unless otherwise stated, the following facts are drawn from the FAC and the above-referenced Client Manual and Wire Transfer Agreement. The facts alleged therein are assumed true for the purpose of resolving the instant Motion. *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023) (citation omitted).

Defendant, a national association bank, is chartered in South Dakota and maintains its main office in that state. (FAC ¶ 15.) Plaintiff, a resident of New York, opened a personal savings account (the "Account") with Defendant in 1998, and continued to use that account until 2023. (*Id.* ¶ 14.) During the twenty-five years he engaged Defendant's services, Plaintiff relied on the Account for "ordinary savings account" activities; he never made "large or frequent high-dollar transactions" from the Account. (*Id.* ¶ 22.)

As a national association bank, Defendant is subject to a set of federal laws called the Bank Secrecy Act ("BSA"). The BSA mandates, among other requirements, that regulated banks maintain "procedures and practices mandat[ing] the tracking and reporting of all bank transactions that are over a certain dollar amount, as well as all bank transactions that exhibit certain suspicious characteristics." (*Id.* ¶ 8.) As part of their obligations under the BSA, banks monitor accounts for indicators of "suspicious activity," which include a customer's sending multiple transfers of large amounts of money, transferring funds to "higher-risk geographic location[s]," or conducting banking activity "inconsistent with the customer's business or history" with the bank. (*Id.* ¶ 57 (quotation marks omitted).) Under certain circumstances, banks will report transactions through a document known as "suspicious activity report" or "SAR." (*See id.* ¶ 29 (emphasis omitted).)

In addition to the federally mandated systems, it is "standard industry practice for banks to monitor their elderly customers' transactions for evidence of elder financial exploitation." (*Id.* ¶ 58.) Defendant's own Code of Conduct accordingly requires all of its employees to "comply with the laws, regulations, and Citi policies, standards, and procedures that govern each employee's business, region, and/or function," "report concerns about conduct or situations that may put Citibank's company or its customers at risk," and "[e]scalate unusual or suspicious activity according to the procedures of your business, region, and/or function." (*Id.* ¶ 62 (alterations adopted).) The Code of Conduct stresses regulatory requirements that mandate the reporting to authorities of suspicious activity in countries where Defendant does business, including the United States. (*Id.*) In public materials, Defendant has represented itself as a model of compliance. It has explained its commitment "to protecting [its] customers' assets and safeguarding their financial identity" and has claimed to maintain "internal controls that specifically look for patterns of account activity, such as suspicious withdrawals, that might indicate that one of our elder customers may be the target of an attempted fraud." (*Id.* ¶ 64; *see also id.* ¶ 65 (quoting a Forbes article highlighting Defendant's "efforts to combat elder financial exploitation").)

### 2. The Client Manual

The terms of Citibank's relationship with Plaintiff are outlined in its Client Manual. (*Id.* ¶ 2; *see also* FAC, Ex. A.) This document is a "binding contract that arose when [Plaintiff] first opened the Account in 1998." (FAC ¶ 81.) By its own terms, it provides that "Citibank owes its banking customers 'a duty of ordinary care.'" (*Id.* ¶ 82 (quoting FAC, Ex. A, at 6).) In describing the terms of the contractual relationship, the Manual provides that:

> Unless otherwise expressly agreed in writing, our relationship with you will be that of debtor and creditor. That is, we owe you the amount of your deposit. No

> fiduciary, quasi-fiduciary or other special relationship exists between you and us. We owe you a duty of ordinary care. Any internal policies or procedures that we may maintain in excess of reasonable commercial standards and general banking usage are solely for our own benefit and shall not impose a higher standard of care than otherwise would apply in their absence.

(FAC Ex. A. at 6.) The Manual further includes provisions that govern external funds transfers, including wire transfers. (*See id.* at 22.) As relevant here, the Manual says, "[w]hen you request a funds transfer, you authorize us to debit your account for the amount of the transfer and you also authorize us to charge your account any applicable service fees in accordance with the fee schedule in effect at the time of your request." (*Id.*) The Manual further advises customers that:

> Citibank will rely on the information you provide in making a funds transfer on your behalf. It is your responsibility to provide Citibank[] with accurate information regarding that transfer[] . . . payment will be processed based on the [information] provided by you. Should you provide an incorrect account number and/or beneficiary institution identifier, you understand that any losses resulting from the funds being credited to the wrong account will be your responsibility.

(*Id.*) The manual also describes the security procedure that Defendant employs to verify wire transfers:

> When you place an order for a funds transfer, we will follow a security procedure established for your protection and ours to verify that the transfer has been properly authorized. You understand that the security procedure is designed only to verify the source of the funds transfer instruction and not to detect errors in the content of that instruction or to prevent duplicate transfers. The procedure depends on the means by which you provide instructions to us. . . . By placing a transfer order, you agree to our use of the applicable security procedure. You agree to be bound by any funds transfer request that Citibank receives and verifies in accordance with the security procedure outlined above.

(*Id.*) In describing the mechanisms for a transfer of funds, the Manual states that when funds are transferred to the recipient bank, "they become the property of [that] bank." (*Id.*) The Manual also disclaims responsibility for any resulting losses, stating, "[e]xcept as may be prohibited by federal law, any losses resulting from an incorrect account number or

other misidentification of your beneficiary provided by you are your responsibility and not Citibank's." (*Id.*)

The Manual advises customers that wire transfers are common vehicles for fraud. (*Id.* at 24.) It warns that "incidents of wire transfer scams have increased significantly," and includes in a list of common scams both "phishing" which includes "attempts to obtain sensitive information . . . by posing as a reputable company via email, text, or phone" and "IRS Imposters," including "individuals impersonating as IRS agents." (*Id.*) The Manual urges customers against "send[ing] funds to an individual or business you don't know personally" or "be[ing] rushed into initiating a transfer to anyone claiming an urgent deadline." (*Id.* at 25.) It suggests "[c]heck[ing] the information you include on a wire transfer instruction to verify the information is correct," as well as "[i]ndependently confirm[ing] (whether in-person or through a trusted third-party) the legitimacy of what you are paying for." (*Id.*)

In the event of an erroneous domestic transfer, the Manual informs the customer of the customer's "responsibility to let [Defendant] know of any error, delay or other problem with [a] funds transfer within thirty (30) days from the date [they] receive notification that [Defendant has] transferred the funds." (*Id.*) The Manual states that "Citibank's sole obligation to [the customer]" in event of such an erroneous transfer "is to pay or refund such amounts as may be required under the Uniform Commercial Code Article 4A or by other applicable law." (*Id.*) In the event of an erroneous international transfer, the Manual provides the right "to cancel your international funds transfer request for a full refund within thirty (30) minutes of your authorizing payment for the transfer, unless the funds have been picked up or deposited." (*Id.* at 52.)

### 3. The Wire Transfer Agreement

The Wire Transfer Agreement likewise governs electronic funds transfer requests carried out by Defendant. (*See* Wire Transfer Agreement, at 4–6.) Its terms authorize the bank to "debit [the customer's] account for the amount of [any] funds transfer request" made by the customer. (*Id.* at 5.) Like the Manual, the Agreement explains that "after the funds are transferred to the beneficiary bank, they become the property" of that bank. (*Id.*) It likewise disclaims responsibility for "any losses resulting from any incorrect information," explaining that those losses are the customer's responsibility. (*Id.*) Under the terms of the Agreement, the customer "indemnif[ies] and hold[s] Citibank harmless from and against any and all claims, suits, judgments, executions, liabilities, losses, damages, costs, and expenses" that occur "in connection with or arising out of Citibank acting upon . . . funds transfer requests pursuant to [the] Agreement." (*Id.* at 6.) Again, the customer is expected to notify Defendant of any errors within 30 days and establishes Defendant's "sole obligation" as "to pay or refund . . . amounts . . . required under the Uniform Commercial Code Article 4A." (*Id.*)

### 4. The Internet Scam

On January 30, 2023, when he was seventy-nine years old, Plaintiff fell prey to an internet scam. (FAC ¶ 19.) "[F]raudsters" purporting to be Apple computer support personnel, Charles Schwab Corporation ("Schwab") (a financial services company) employees, and Federal Reserve System (the "Fed") officials reached out to Plaintiff. (*Id.*) The fraudsters convinced Plaintiff that three of his financial accounts were threatened by "foreign hackers." (*Id.*) The fraudsters claiming to be from Schwab persuaded Plaintiff to liquidate his holdings that were formerly in a Schwab account. (*Id.* ¶ 20.) They told him to transfer the proceeds to the Account maintained with Defendant. (*Id.*) Plaintiff was then directed to transfer the funds to accounts at

two Hong Kong banks (the Bank of East Asia and Hang Seng Bank) that were "safe" because they were maintained by the Fed. (*Id.*) Plaintiff was told that, when the funds were at the accounts, the hackers would be neutralized, the funds would be returned to the original financial institutions where Plaintiff had kept them, and they would be placed in new accounts. (*Id.*)

Beginning on January 31, 2023, Plaintiff undertook the first of seven unusual transactions. (*Id.* ¶ 24.) As instructed, he liquidated the assets in his Schwab account and deposited $431,700.00 in the Citibank Account via wire transfer. (*Id.* ¶ 25.) The next day, February 1, he ordered an outgoing wire totaling $245,150.00; this sum was refunded to the Account on February 3. (*Id.* ¶ 26.) After the refund on February 3, Plaintiff ordered another wire transfer, also totaling $245,150.00 to an account at the Bank of East Asia under the name Kuk Siu Mui. (*Id.* ¶ 27.)

Despite the earlier refund, Citibank executed the February 3 transfer. (*Id.* ¶ 28.) Plaintiff says this never should have occurred. (*Id.*) The transfer "was for a very large, round number, made by an elderly customer, far in excess of any transaction that [Plaintiff] had previously sought to process, conducted after an enormous sum of money had been transferred into [Plaintiff's] account, and sent to a foreign bank, with which [Plaintiff] never previously transacted." (*Id.*) So, Plaintiff says, Defendant's policies and employee training would have mandated that, after the transfer, Defendant open an immediate investigation to determine whether Plaintiff fell victim to elder financial fraud. (*Id.*) Further, Defendant's policies required it issue an SAR to the appropriate authorities, alerting them to this transfer. (*Id.* ¶ 29.) As a result, Plaintiff says, his account would have been frozen, and no further transactions could have been completed. (*Id.*) This reporting activity did not occur, however, and Plaintiff's account remained active. (*Id.* ¶ 30.) So, on February 6, Plaintiff was able to order another outgoing wire

transfer from the Account in the amount of $186,550.00 to the same Bank of East Asia account under Kuk Siu Mui's name. (*Id.* ¶ 31.) Despite similar hallmarks of fraud, Defendant again failed to investigate the transaction or freeze the account. (*Id.* ¶¶ 32–33.)

On February 10, Plaintiff liquidated "most of the assets" in an Individual Retirement Arrangement ("IRA") he held at Muriel Siebert & Co., a financial services company. (*Id.* ¶ 34.) He then deposited $610,000.00 of the proceeds in the Citibank Account via wire transfer. (*Id.*) On February 13, Plaintiff ordered an outgoing wire transfer of $248,550.00 from the Citibank Account to an account with Hang Seng Bank under the name Huang Shunzhi. (*Id.* ¶ 35.) Still, no investigation or freeze occurred. (*Id.* ¶ 37.) And on February 14, Plaintiff transferred another $248,850.00 to the same account with Hang Seng Bank under the name Huang Shunzhi. (*Id.* ¶ 38.) Yet again, no investigation or account freeze occurred. (*Id.* ¶ 40.) The very next day, February 15, Plaintiff ordered a wire transfer of $112,600.00 to the same account with Hang Seng Bank under the name Huang Shunzhi. (*Id.* ¶ 41.) Still, there was no investigation, nor was his account frozen. (*Id.* ¶ 43.)

Almost a week later, on February 21, Plaintiff liquidated most of the assets in an IRA at BNY Mellon/Pershing and deposited $470,000.000 in his Citibank Account through a wire transfer. (*Id.* ¶ 44.) On February 22, he wired $248,900.00 to an account at Hang Seng Bank. (*Id.* ¶ 45.)[2] Again, Defendant conducted no investigation of the account, and the account remained active. (*Id.* ¶ 47.) Finally, on February 23, Plaintiff ordered "one last wire transfer" from the Account. (*Id.* ¶ 48.) This transfer was for $221,100.00 to Hang Seng Bank for a

---

[2] It is not entirely clear whether this is the same Hang Seng Bank account described above. Plaintiff's FAC claims that this transfer was to "the same account with Hang Seng Bank in the name of Huang Quanzhu." (FAC ¶ 45.) But the earlier-described account was alleged to be under the name of Huang *Shunzhi*, rather than Huang Quanzhu. (*Id.* ¶ 41.)

recipient named Huang Quanzhu. (*Id.*) For each of these transfers, Plaintiff claims that the transactions had multiple hallmarks of fraud, and yet Defendant took none of the fraud-prevention actions it was required to carry out under the Account Agreement and pursuant to its internal policies, which, he says, would have resulted in the account being frozen and no further depletion of his assets. (*Id.* ¶¶ 32–52.)

C. Procedural Background

Plaintiff initiated this Action on February 2, 2024. (*See* Compl. (Dkt. No. 1).) On April 30, 2024, Defendant filed a letter seeking leave to file a motion to compel arbitration. (Letter from Bryan D. Leinbach, Esq., to Court (Apr. 30, 2024) (Dkt. No. 7).) Defendant withdrew this application on June 10, 2024, (Letter from Bryan D. Leinbach, Esq. to Court (June 10, 2024) (Dkt. No. 12)), and, a week later, filed a letter seeking leave to file the instant Motion, (*see* Letter from Bryan D. Leinbach, Esq. to Court (June 17, 2024) (Dkt. No. 14)). Plaintiff filed a response on June 24, 2024. (*See* Letter from Jeffrey S. Gavenman, Esq. to Court (June 24, 2024) (Dkt. No. 15).) On July 12, 2024, the Court held a pre-motion conference, during which it adopted a briefing schedule. (*See* Dkt. (minute entry for July 12, 2024); Mot. Scheduling Order (Dkt. No. 17).)

Pursuant to that briefing schedule, Defendant filed its first Motion to Dismiss on August 2, 2024. (*See* Motion to Dismiss (Dkt. 18).) Briefing was completed on September 13, 2024. (*See* Reply Mem. of Law (Dkt. No. 25).) The Court issued a decision on December 18, 2024, granting Defendant's Motion to Dismiss in its entirety, and dismissing without prejudice Plaintiff's sole claim in his initial Complaint, which was a breach of contract claim. *Markatos*, 760 F. Supp. 3d at 73, 87. That decision provided Plaintiff a thirty-day window to file an

13

amended complaint alleging additional facts or otherwise addressing the deficiencies described in the opinion. *See id.*

Plaintiff filed his Amended Complaint on January 17, 2025. (*See generally* FAC.) Defendant filed a pre-motion letter regarding a proposed motion to dismiss the Amended Complaint on January 31, 2025, (*see* Letter from Bryan D. Leinbach, Esq. to Court (Jan. 31, 2025) (Dkt. No. 31)), to which Plaintiff responded on February 7, 2025, (*see* Letter from Jeffrey S. Gavenman (Feb. 7, 2025) (Dkt. No. 32)). The Court held a pre-motion conference on March 6, 2025, during which it again adopted a briefing schedule. (*See* Dkt. (minute entry for March 6, 2025); Mot. Scheduling Order (Dkt. No. 34).) After the Parties mutually consented to an extension of that schedule, Defendant filed its Motion to Dismiss on April 18, 2025, (*see* Mot. to Dismiss; *see also* Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s Mem.") (Dkt. No. 39)), Plaintiff filed his opposition on May 30, 2025, (Pl.'s Opp'n), and Defendant filed its reply on June 20, 2025, (Reply Mem. of Law ("Def.'s Reply") (Dkt. No. 43)).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration

14

adopted) (internal quotation marks and citation omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, as noted above, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank*

15

*of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also*

*Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

B.  Analysis

Plaintiff brings six claims for breach of contract.  (FAC ¶¶ 72–120.)  He identifies a

"duty of ordinary care" owed to him by Defendant "as reflected" in the Manual.  (*Id.* ¶ 74.)  He

asserts that the circumstances surrounding each transfer "presented [Defendant] and its personnel

with clear evidence of elder financial exploitation and should have subsequently triggered

Citibank's duty to investigate" each of the transactions pursuant to its exercise of ordinary care.

(*Id.* ¶ 76.)  In essence, the primary difference between Plaintiff's initial Complaint and his FAC

is that while the Complaint alleged that Defendant breached its agreement with Plaintiff through

the "execution of the wire transfers themselves," (Pl.'s Opp'n 5), the FAC rests on a theory that

Defendant "breached its contractual duty of ordinary care to Plaintiff *after* each wire transfer had

been executed, when Defendant ignored the numerous red flags raised by the circumstances

attendant to those transactions," (*id.* at 6 (emphasis in original)).  Plaintiff also alleges that

Citibank's internal policies required that it "issue a suspicious activity report ('SAR') to the

appropriate federal authorities," (FAC ¶ 29 (emphasis omitted)), after "each wire" transfer, (*id.*

¶ 66).

In response, Defendant advances three arguments.  First, it submits that the law of the

case doctrine mandates that the breach of contract claims are preempted by N.Y. UCC Article

4A.  (Def.'s Mem. 18–20.)  Next, it claims that Plaintiff fails to satisfy the pleading standard for

alleging a breach of contract claim, a conclusion it argues is likewise compelled by the law of the

case doctrine.  (*Id.* at 20–23.)  Finally, Defendant asserts that, even if the law of the case doctrine

does not apply, the FAC still must be dismissed because the claims are preempted by the UCC,

barred by the Client Manual and Wire Transfer Agreement, and because Plaintiff failed to allege a breach of the client manual. (*Id.* at 24–28.) The Court will address Defendant's arguments to the extent necessary to resolve the instant Motion.

### 1. Article 4-A Preemption

The Court begins with the threshold question whether Articles 4 and 4-A preempt Plaintiff's breach of contract claim under New York law. Although the Court set forth the law governing Article 4-A Preemption at length in its prior opinion, *see Markatos*, 760 F. Supp. 3d at 80–84, some recapitulation is warranted here.

Article 4-A of New York's Uniform Commercial Code applies to "electronic funds transfers, commonly known as wholesale wire transfers," like the transactions alleged in this case. *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 87 (2d Cir. 2010) (citing N.Y. UCC § 4-A-102 & cmt.). The Article's "comprehensive body of law" relies on "precise and detailed rules" that allocate responsibility, in part because the scheme prior to its enactment relied on courts to apply general principles of common law or equity, which resulted in a dissatisfactory and piecemeal regime for these claims. *Id.* at 89; *see also Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 650 F. Supp. 3d 62, 74–75 (S.D.N.Y. 2023) ("Article 4-A was adopted because 'attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory.'" (quoting N.Y. UCC § 4-A-102 (cmt.)). The Article 4-A scheme, now in place, acts as the "exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article," *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 801 (2d Cir. 2011) (quotation marks and citation omitted), and therefore the statute has a preclusive effect on common law

17

claims that would impose "liability inconsistent with the rights and liabilities expressly created [under the] Article," *see Niram, Inc. v. Sterling Nat'l Bank*, 697 F. Supp. 3d 15, 28 (S.D.N.Y. 2023) (citing *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 103 (2d Cir. 1998)).

To determine whether a claim is consistent with the regime (and therefore not precluded), courts look to "whether [Article 4-A's] provisions protect against the type of underlying injury or misconduct alleged in a claim." *Ma*, 597 F.3d at 89–90.  In other words, "[i]f the common law claim is inconsistent with Article 4A (or is expressly addressed by Article 4A), then the common law claim is considered displaced and must be dismissed." *Huang v. Hong Kong & Shanghai Banking Corp. LTD*, No. 20-CV-03548, 2022 WL 4123879, at *3 (S.D.N.Y. Sept. 9, 2022).  As the Court described in its previous opinion,

> "[C]ommon law claims about the existence of unauthorized wire transfers or an unauthorized signature on a check, and the mechanics of how those transactions were conducted, fall within the regime of Article 4-A," *2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 236 (S.D.N.Y. 2011), because "Section 4-A-204 provides the exclusive means by which a bank has a duty to refund a customer for such an unauthorized payment," *Niram*, 697 F. Supp. 3d at 30; N.Y. U.C.C. § 4-A-204 (providing that a bank must refund the customer where it "accepts a payment order issued in the name of that customer as sender which is not authorized and not effective as the order of the customer under Section 202"); *see also Fischer*, 632 F.3d at 797 (noting Article 4-A permits some of its provisions to be modified by contract).  In contrast, claims not based on the mechanics of the transfer itself—such as claims "based on Defendant's actions before and after the processing of the wire transfer"—are not always preempted.

*Markatos*, 760 F. Supp. 3d at 80–81 (alterations adopted).

So far, this Opinion treads familiar ground: this same preclusion doctrine formed the basis of the Court's earlier decision dismissing Plaintiff's initial Complaint.  *See generally*, *Markatos*, 760 F. Supp. 3d at 79–84.  Defendant thus argues that this Court is bound to dismiss Plaintiff's Amended Complaint under the law-of-the-case doctrine.  (*See* Def.'s Mem. at 18–20.) Accordingly, a brief discussion of that doctrine is also necessary.

Under the law-of-the-case doctrine, "a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation." *Brentwood Pain & Rehab. Servs.*, *P.C. v. Allstate Ins. Co.*, 508 F. Supp. 2d 278, 288 (S.D.N.Y. 2007) (citing *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)); *see also Musacchio v. United States*, 577 U.S. 237, 244-45 (2016) ("The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (internal quotation marks omitted)); *United States v. Plugh*, 648 F.3d 118, 123 (2d Cir. 2011) (explaining that "[a]s a general matter . . . [a court should] adhere to its own decision at an earlier stage of the litigation" (internal quotation marks omitted)).  This doctrine "forecloses [only the] consideration of issues that have already been decided," *U.S. Bank Nat'l Ass'n ex rel. Lima Acquisition LP v. PHL Variable Ins. Co.*, No. 12-CV-6811, 2014 WL 998358, at *4 (S.D.N.Y. Mar. 14, 2014) (internal quotation marks omitted), and is "discretionary" such that it "does not limit a court's power to reconsider its own decisions prior to final judgment," *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir. 1996) (internal quotation marks omitted); *see also Musacchio*, 577 U.S. at 245 ("The [law-of-the-case] doctrine expresses the practice of courts generally to refuse to reopen what has been decided, but it does not limit courts' power." (alteration and internal quotation marks omitted)); *Ozturk v. Hyde*, 155 F.4th 187, 211 (2d Cir. 2025) (Nathan, *J.*, writing for majority of voting judges in denial of rehearing en banc) ("Under our law of the case doctrine, when a court decides upon a rule of law, that decision should generally continue to govern the same issues in subsequent stages in the same case.  That is a discretionary doctrine of sound, albeit not inexorable, practice, permitting adjustment of prior rulings for cogent or compelling reasons." (quotation marks and citations omitted)).

19

To determine "whether the law-of-the-case doctrine is an impediment to Plaintiff's claim in its current form" the Court must consider whether "Plaintiff, in fact, amended [his] initial Complaint to such an extent that the Court's prior . . . holdings no longer suffice to resolve the instant Motion." *Masciotta v. Clarkstown Cent. Sch. Dist.*, No. 14-CV-7128, 2016 WL 4449660, at *5 (S.D.N.Y. Aug. 23, 2016). The Court concludes that, on the Article 4-A Preemption issue, Plaintiff has sufficiently amended his complaint such that the disposition of the initial Complaint does not determine the outcome of the Motion to Dismiss the FAC. As Plaintiff correctly argues, the law of the case doctrine has no application where a complaint, after amendment, "'alleges materially different and more detailed claims' than the original complaint." (Pl.'s Opp'n 9 (quoting *Kregler v. City of New York*, 821 F. Supp. 2d 651, 658 (S.D.N.Y. 2011), *aff'd*, 604 F. App'x 44 (2d Cir. 2015)).) *See also Barkai v. Neuendorf*, No. 21-CV-4060, 2024 WL 710315, at *5 (S.D.N.Y. Feb. 21, 2024) (acknowledging that "to the extent that Plaintiff offers new claims or factual allegations that arguably address the deficiencies the Court previously identified, the Court will consider those claims anew" (quotation marks omitted, alteration adopted)); *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015) (same), *aff'd*, 626 F. App'x 20 (2d Cir. 2015). Plaintiff's Amended Complaint is crystal clear that Plaintiff seeks to advance the theory that Defendant breached its contract with Plaintiff when it failed to act *after* each wire transfer. (*E.g.*, FAC ¶ 30 ("[F]ollowing the February 3 Transfer, Citibank failed to investigate the recent activity in Mr. Markatos' account. Citibank also failed to issue, or failed to pay appropriate attention to, a[] SAR . . . and failed to freeze Mr. Markatos' account . . . .").) And the Court's previous Opinion expressly recognized that "claims not based on the mechanics of the transfer itself—such as claims based on Defendant's actions *before* and *after* the processing of the wire transfer—are not always preempted." *Markatos*, 760 F. Supp. 3d at 81 (quotation

20

marks and citations omitted).  Accordingly, the holdings contained in the Court's previous decision do not determine the Article 4-A preemption question here, and the Court evaluates that question on the merits.

The Court will assume, without deciding, that the claims are not preempted by UCC Article 4-A.  At least some courts in this district have held that common-law claims are not preempted where they rely allegations that a bank failed to follow certain measures *after* the processing of a claim—rather than simply being premised on an argument that the *processing* of the claim was inappropriate.  *See, e.g., Essilor Int'l SAS*, 650 F. Supp. 3d at 84 (concluding claims were not preempted where they were based on larger cash management system that applied "at the end of each day to the balances in the participating accounts," and therefore involved "conduct wholly outside of wire transfers and establishes rights and liabilities that are not addressed by Article 4-A"); *Huang,* 2022 WL 4123879, at *3; (denying a motion to dismiss "insofar as it seeks dismissal, under a UCC displacement theory, of [the p]laintiff's common-law claims based on circumstances outside of the mechanics of the wire transfers"); *Pedersen v. MidFirst Bank*, 527 F. Supp. 3d 188, 193 (N.D.N.Y. 2021) (reasoning that claims "based on [the defendant bank's] actions before and after the processing of the wire transfer" were "not preempted").

The Court notes, however, that it has serious doubts as to the conclusion that Article 4-A does not preempt claims based on the security measures that banks follow before and after wire transfers.  While it is true that the Second Circuit has acknowledged that claims based on actions *before* and *after* the processing of a wire transfer are not *always* preempted, it does not follow that *every* claim based on activities before or after the transfer is not preempted.  This is why the Second Circuit has instructed that the proper inquiry relies on an examination of the "type of

21

underlying injury" or "misconduct" alleged in the complaint. *See Ma*, 597 F.3d at 89–90. The only harm Plaintiff has alleged that he experienced stems from the processing of each of the transactions, and so his injuries are inevitably the same "type of underlying injury" as alleged in his initial Complaint. The Court also notes that other courts in this District—even in the months since the prior Opinion in this Action—have rejected claims based on "the warning procedures [a bank] implemented, or failed to implement, *after* receiving a payment order" on the basis that those procedures are part of the "mechanics of wire transfers." *McCarthy v. JP Morgan Chase Bank*, 772 F. Supp. 3d 298, 313 (E.D.N.Y. 2025) (emphasis added), *appeal withdrawn,* No. 25-1041, 2025 WL 2985923 (2d Cir. Oct. 9, 2025); *see also Forrence Orchards, Inc. v. TD Bank*, 766 F. Supp. 3d 364, 370 (N.D.N.Y. 2025) ("In this instance, Plaintiff's complaint references events happening before and after the transfers, but the common law claims themselves concern only the fraudulent transfers and the bank's refusal to return the transferred funds, issues . . . directly addressed under Article 4-A. Accordingly, the Court dismisses Plaintiff's breach of contract and negligence claims against TD Bank on the basis that they are preempted." (citations omitted)); *see also United States ex rel. Pinnacle Env't Corp. v. Volmar Constr.*, No. 23-CV-10732, 2024 WL 4892740, at *1 (S.D.N.Y. Nov. 25, 2024) (concluding that a claim based on an alleged failure "to properly monitor, and therefore, detect" that an account to which funds were wired was fraudulent was "plainly preempted" by Article 4-A, as it "would imply a duty—to monitor and investigate transfer instructions submitted by a bank's clients before sending a wire—that is wholly absent from the U.C.C."). In other words, "Article 4-A's text strong[ly] suggests that it applies to claims asserting the existence of unauthorized wire transfers regardless of what the claim may be called, and . . . the accompanying commentary is pellucid on the issue." *Superb Motors Inc. v. Deo*, 776 F. Supp. 3d 21, 92 (E.D.N.Y. 2025), *adhered to in*

22

*relevant part on reconsideration,* No. 23-CV-6188, 2025 WL 2178194 (E.D.N.Y. Aug. 1, 2025).

These cases suggest that Plaintiff's claims in the FAC, too, may be preempted by the UCC, given

that the claims are premised on the operation (or lack thereof) of the Defendant bank's post-wire-

transfer security measures.

2. Breach of Contract Claim

Assuming, without deciding, that Plaintiff's breach of contract claims are not preempted,

the Court concludes that Plaintiff's breach of contract claim is insufficiently pled, and must be

dismissed.  Indeed, *this* conclusion is clearly compelled by the law-of-the-case doctrine, as well

as the existing case law.  As the Court explained in its previous Opinion,

> There is no dispute that the Parties had a contract in the form of the Client Manual
> or that Plaintiff completed his obligations under this agreement.  Instead, the single
> element in dispute is whether Plaintiff sufficiently pled that Defendant breached
> any provision of that agreement. Plaintiff points to one contractual provision—
> stating that Defendant owes Plaintiff "a duty of ordinary care," which is undefined
> in the Manual, (Compl. Ex. A at 5)—and alleges that Defendant breached it by: (i)
> "fail[ing] to maintain or fail[ing] to employ its industry-standard protocols, which,
> if properly maintained and employed, would have led Citibank to flag, investigate,
> and intervene" in the wire transfers; and (ii) "fail[ing] to recognize or fail[ing] to
> respond to obvious evidence of elder financial exploitation," (Compl. ¶ 39).

*Markatos*, 760 F. Supp. 3d at 84.  Despite Plaintiff's filing of his Amended Complaint, nothing

has meaningfully changed.  Yet again, Plaintiff alleges that, based on the contractual

relationship, "Citibank owes Mr. Markatos [a] . . . duty to exercise ordinary care," one both

implied and expressly provided for in the client manual.  (FAC ¶ 2.; *see also id.* ¶ 53 ("[T]he

Account Agreement *expressly* provides that Citibank owes its banking customers 'a duty of

ordinary care.'" (emphasis in original)).)  As with the initial Complaint, the Amended Complaint

relies on a purported failure to maintain or employ the bank's "industry-standard protocols,

which, if properly maintained and employed, would have led Citibank to flag, investigate, and

intervene" in the wire transfers, and therefore "failed to recognize or failed to respond to obvious

evidence of elder financial exploitation." (*Id.* ¶ 67.) In other words, Plaintiff advances the same facts in support of the existence of a duty. But, the Court already determined, "far from pleading a breach of contract, Plaintiff has only demonstrated the Defendant complied with the Client Manual" and further, that the bank's asserted "fail[ure] to adhere to its own Code of Conduct or follow industry-standard practices—none of which are mandated in the Manual—are plainly insufficient to plead breach of contract." *Markatos*, 760 F. Supp. 3d at 85–86.[3] The Court is bound by its earlier determination that these allegations are insufficient. Even if it were not bound by that decision, the Court would conclude that this claim fails because it is "inconsistent with the language of the . . . contract[]." *Pinnacle*, 2024 WL 4892740 at *2.

Plaintiff's primary response to this argument is, apparently, that "Plaintiff agrees that each of the wire transfers was executed in accordance with Citibank's policies, including the Client Manual," but that the bank's duty of care to him was breached "*after* each one of the wire transfers were executed." (Pl.'s Opp'n at 14 (emphasis in original).) The Court concludes that these "vague allegations" that breach occurred through an absence of ordinary care or non-

---

[3] It is true that, in the FAC, Plaintiff also included allegations that Defendant failed to investigate whether Plaintiff was a victim of elder financial fraud, and that Defendant was obligated to issue a SAR about his account activity. (*See* FAC ¶¶ 28, 32, 36, 39, 42, 46, 49.) But the former allegation does not change the analysis because it is tantamount to an allegation that the bank failed to adhere to industry-standard practices that are not mandated in the Manual or the Agreement. As to the allegations about Defendant's regulatory compliance obligations, "[c]ourts have . . . refused to create a duty of care predicated on the BSA's statutory requirements." *Lundstedt v. Deutsche Bank Nat'l Tr. Co.*, No. 13-CV-001423, 2016 WL 3101999, at *5 (D. Conn. June 2, 2016); *Chappell v. Bank of Am., N.A.*, 794 F. Supp. 3d 174, 186 (S.D.N.Y. 2025) (same); *see also In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010) ("[B]ecause the Bank Secrecy Act does not create a private right of action, the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements."); *Aiken v. Interglobal Mergers & Acquisitions*, No. 05-CV-5503, 2006 WL 1878323, at *2 (S.D.N.Y. July 5, 2006) (declining to "impose a duty of care based upon [the BSA,] a statute that does not permit a private right of action").

mandated industry-standards fails to state a claim for breach of contract.  *See Beck v. Metropolitan Bank Holding Corp.*, 747 F. Supp. 3d 442, 460–61 (E.D.N.Y. 2024) (holding the plaintiff did not state a plausible breach of contract claim "because [the plaintiff] do[es] not plausibly allege that the Agreements required [the defendant] to 'adopt and implement security procedures reasonably designed to protect [the plaintiff]' from wire transfers that [the plaintiff] authorized due to misrepresentations of a third party."); *Banco del Austro, S.A. v. Wells Fargo Bank, N.A.*, 215 F. Supp. 3d 302, 306 (S.D.N.Y. 2016) (dismissing a breach of contract claim based on failure to adhere to security procedures because the plaintiff "does not plausibly allege that [the defendant] deviated from that procedure"); *cf. 2006 Frank Calandra*, 816 F. Supp. 2d at 237 ("The bank-customer relationship provides for no greater implied responsibilities than those expressly stated in the banking agreements.").

### III.  Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss Plaintiff's Amended Complaint is granted.  Given that the Court already granted Plaintiff leave to amend his complaint once, and in light of the fact that, even after receiving leave to amend, Plaintiff filed a substantially similar document that failed, in part, for reasons identical to the failure of his initial Complaint, the Court dismisses Plaintiff's Amended Complaint with prejudice.  *See, e.g.*, *Shields v. NYC Health & Hosps. Corp.*, 489 F. Supp. 3d 155, 167 (E.D.N.Y. 2020) ("Because Plaintiff has already been given an opportunity to amend, the complaint is dismissed with prejudice."); *Obanya v. Select Portfolio Servicing, Inc.*, No. 14-CV-5255, 2016 WL 11265648, at *6 (E.D.N.Y. Aug. 23, 2016) (taking same approach), *report and recommendation adopted*, No. 14-CV-5255, 2017 WL 253483 (E.D.N.Y. Jan. 20, 2017).  The Clerk of the Court is respectfully

directed to terminate the pending Motion at Dkt. No. 37, enter judgment for Defendant, and close this case.

SO ORDERED.

Dated:    March 26, 2026
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

26